LIEBIG'S EXTRACT OF MEAT CO., Limited, v. LIEBIG EXTRACT CO.

(Circuit Court, S. D. New York. May 4, 1909.)

1. TRADE-MARKS AND TRADE-NAMES (§ 10*)—NAMES SUBJECT TO APPROPRIATION—"LIEBIG."

The name "Liebig," as applied to extracts of meat, has been in common use by many in this country for many years to designate preparations supposed to have been made by Liebig's process, and is common property, which no longer designates, if it ever did, the product of a particular manufacturer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 14; Dec. Dig. § 10.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 86*)—UNFAIR COMPETITION—IMITATION OF CORPORATE NAME.

"Liebig's Extract of Meat Company, Limited," an English corporation, *held* not entitled to an injunction to restrain the "Liebig Extract Company," of New York, from using its own name in a competing business in this country; the defendant having adopted and continuously used the name since a time before complainant opened an office here on the same street.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. § 86.*

Use of corporate or firm names, see notes to R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 17 C. C. A. 579; Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Medicine Co., 27 C. C. A. 357.]

In Equity. Final hearing on the merits.

James L. Steuart and Steuart & Steuart, for complainant.
Herbert S. Murphy, for defendant.

PLATT, District Judge. This is the result of final hearing upon a bill in equity asking for an injunction and accounting. The complainant asked for a preliminary injunction in this matter. The motion was denied on June 6, 1907. Judge Lacombe filed with the denial a brief memorandum.

Evidently the moving papers had been based upon defendant's sales of the "Liberty" brand, as well as the "Red Cross" brand. Charges of specific instances of fraudulent misrepresentation were made in the affidavits with greater vigor than can be found in the final proofs. The judge at the earlier hearing was satisfied, I think,

just as I am, that the defendant was wrong in putting on the market the so-called "Liberty" brand. The sales, however, had been trivial in amount, and had been abandoned before suit. Complainant was given leave to come back, if further sales of the "Liberty" brand were discovered. All other questions were left for final hearing. No further sales of "Liberty" brand have been discovered, and the general charge of fraud has weakened as time has passed.

The only matter, then, left for me to decide, is the situation which has arisen by reason of the defendant's sales of the "Red Cross" brand. I understood at the hearing that this was what the complainant wished, and I shall take him at his word. If the complainant shall hereafter demand and obtain narrower relief, it must in no sense be considered a reversal of my views on the whole case. If I am deemed to be wrong on the broad contention which complainant now makes, I shall try to accept the rebuke with equanimity.

The complainant is an English corporation, which sells large quantities of Liebig's Extract of Meat in the United States. In its direct attack upon the defendant's sales of the so-called "Red Cross" brand of Liebig's Extract of Meat, it necessarily demands the exclusive right to attach to its product the word "Liebig," or the words "Liebig's Extract," or the words "Extractum Carnis," with or without Liebig, on the broad ground that such or a similar use of those or like expressions indicates to the consumer that the extract of meat so sold is made by the complainant. The defendant insists that such words and expressions simply indicate that the extract of meat contained in the package so labeled is made in accordance with the Liebig formula or process, and that, if Baron Liebig ever did have any personal and proprietary rights therein (which is strenuously denied), he dedicated them to the public ages ago, and that ever since such dedication the general public has had the same right to make goods in accordance with the Liebig process that it has to make Dover's powders, and may say so in any way it pleases, which does not invade the rights of an individual member of the public to do the same thing.

It is probable that from a chemical and scientific standpoint Baron Liebig is entitled to the credit of having invented the process whereby beef carcasses could be so treated as to leave behind a concentrated extract of value. It is certain that the general public has always been of that opinion. He also helped out in the commercializing of that process. He did both of these things, however, before he undertook to convey his personal rights and privileges to the predecessor of the complainant. The rights to his process, both scientific and commercialized, had therefore become public property before the complainant undertook to maintain its broad right to the name as applied to the process. The courts of England refused to confirm that broad right in the complainant. The courts of this country have also, whenever squarely confronted with the issue, taken the same negative attitude. We now meet the broadest of all the broad contentions, and are asked to apply the results of a favorable conclusion thereon to the complainant's product as an article of American commerce; and we are asked to do this in despite of the historical facts with which the record is crowded.

The complainant has adopted a somewhat curious way of proving that the name "Liebig," when found on packages of meat extract, guides the public directly to the complainant. He goes about the country among his own customers, and picks out in each locality some member of the firm of excellent standing and reputation. This can be easily done, because complainant is dealing with the very best class of trade in the country. After putting the witness through the usual preparatory paces, he produces a package of complainant's Extract of Meat, with its peculiar earmarks and indicia, and asks him whether he is familiar with that package, and (to clench the matter before the answer comes) whether it is a package which he knows as the package of Liebig's Extract of Meat. In view of the fact that the witness has been dealing for a long time in packages of which the one presented is a fac simile, and in no other kind of package of Liebig's Extract, it is not unnatural that he should answer that it is a package with which he is thoroughly familiar, that he has known it for many years, and that it has been always the same. He is thus prepared to respond to a series of leading questions, which the court, by adopting Liebig's scientific process, may boil down into an expression by the witness of an opinion that when people ask his house for Liebig's Extract of Meat, and say nothing more, he thinks they mean the extract manufactured by complainant, and sends that along as a compliance with the order. This method of trade would go very well with old, established, regular customers; but it is hard to believe that it could be successfully applied to all purchasers, after reading the evidence at large in the record before me.

It will be noticed, further, that all witnesses of that class think the one ordering Liebig's Extract of Meat, without more, refers to the "genuine brand." The distinction implies the knowledge that there are other brands. The house dealing in imported goods would naturally think, on receiving a blind order, that the customer wanted the imported, rather than the domestic, article. The record is replete with testimony that all kinds and descriptions of brands of Liebig's Extract of Meat have for many years been manufactured and sold by domestic makers to the domestic trade; and in every case where the domestic maker has taken pains to so differentiate his package from the complainant's as to eliminate any possibility of error, his right to make Liebig's Extract of Meat has been sustained by the courts. The right to do so was common property before the complainant existed, and it is common property to-day. It would be a pleasant task to take the matter up in detail, and, after setting forth my findings drawn from a mass of subordinate facts, to lead up by slow stages to my various subordinate conclusions, and from them to my final conclusion; but lack of time compels me to refrain.

Complainant's package, with its earmarks and individualities, has been used for so many years in practically unvarying form that, beyond doubt, it points directly to complainant; but I cannot find any satisfactory proof that any package, of any shape, with any marking, which has thereon "Liebig," or "Liebig's Extract," or "Liebig's Extract of Meat," with or without "Extractum Carnis" added thereto, no matter how distinct the endeavor to differentiate may be, will direct the

average public consumer toward the complainant, or, putting it in another way, tend to raise in his mind a belief that the complainant made the article which it contains.

As to the use by defendant of its corporate name: Defendant was incorporated and settled down to business at 48 Hudson street, New York City, with loud assertion of what its business was, long before the complainant opened an office of its own in the city. It has carried on its business openly, and increased its sales, under the eyes of the complainant and its agents and without protest. Complainant says it waited for the outcome of other suits against other parties before bringing this one; but surely no act of any party could, from complainant's view point, be as wanton and outrageous as that of a competitor who deliberately takes a name which inherently commits a trespass on complainant's rights. It is passing strange that complainant could sit calmly by and see a party on the same street adopting a dress which was in and of itself a trespass, before one even had a chance to examine the goods which he made, without crying to high heaven in protest. If the trespass were a flagrant one, it might be possible to overlook the laches; but complainant's conduct ought certainly to excuse a court of equity from a serious discussion of the "Liberty" brand proposition.

I would like to talk about the complainant's assertion that it makes its extract under a secret process of its own. The general public surely thinks that it makes it under the Liebig process. If it is not so making its product, is it not deceiving the public, and how can it claim rights from Baron Liebig, if it has abandoned the process that Liebig invented? I must stop myself with a firm hand, or I shall go on ad infinitum, if not ad nauseam.

All these things and many others being clearly accentuated in my mind, it follows as a matter of course that the bill should be dismissed, with costs; and it is so ordered.